IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| -vs- | §  SA-20-CR-342-XR |
| WILLIAM OLIVER TOWERY,<br>*Defendant* | § |

## VERDICT AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 14, 2022, a bench trial was held in this case. Prior to trial, the Defendant signed a waiver of his right to a trial before a jury.[1] In addition, the Court conducted a verbal colloquy with the Defendant.[2] The waiver was (1) knowingly and intelligently entered, and (2) voluntary.

William Towery, age 55, was formerly employed as an Investigator with the Texas Attorney General's Office, as a police officer and substitute teacher with the Judson I.S.D., and as a reserve police officer with the San Marcos Police Department.[3] He possesses a bachelor's degree in criminal justice, with a major in law enforcement.

On July 29, 2020, an Indictment was filed charging the Defendant with sending a message in interstate commerce threatening then-presidential candidate Joe Biden in violation of 18 U.S.C. § 875(c).

On or about December 11, 2019, William Towery received a text message that stated: "Hey William - - it's Sam with the Biden campaign. Joe is heading to San Antonio on Friday for a

---

[1] Docket No. 42.
[2] Docket No. 41.
[3] Gov't Ex. 2 and 5.

1

community event. Can you join us?" Towery responded: "I'll be there and have been practicing my sniping skills all month just for this occasion. If you will be near him you may want to wear something dark to hide the blood splatter."[4] The parties have stipulated that the text sent by the Defendant on December 11, 2019, and received by Jaclyn Gelfond, a Biden campaign staffer, traveled in interstate commerce from New Braunfels, Texas, through the Sprint text server in Lee's Summit, Missouri, to Philadelphia, Pennsylvania.[5]

Jaclyn Gelfond received the text from Towery, became scared, and notified her supervisor. The campaign tech team was able to determine that the text came from William Towery. Samuel D. Salk of the Biden campaign notified Secret Service agents of the text as he took the text as a real threat. Secret Service agent Morales notified San Antonio Police Det. David Snow, assigned to the South Texas Intelligence Task Force Fusion Center, that a threat had been made against then-candidate Joe Biden. At that time, Secret Service protection was not yet initiated for then-candidate Biden, and local law enforcement was contacted. Det. Snow took the text message as a threat. Inasmuch as then-candidate Biden was expected to be in San Antonio within hours, Det. Snow immediately sought the assistance of the New Braunfels Police Department because it was believed that Towery lived there. In addition, the text was determined to be sent from Sprint as a carrier service, and an expeditious request was made to Sprint to determine the location of the phone and to determine whether the phone was near the scene of the Biden campaign event. A "BOLO" or "Be on the Lookout" was sent to law enforcement officers securing the Biden campaign event. The "BOLO" contained a description of Towery.

---

[4] Gov't Ex. 1 and 7.
[5] Gov't Ex. 4; Docket No. 43.

A "ping" to the Sprint cell phone indicated that the phone was near or at Towery's home. Because of safety concerns by law enforcement, when they approached Towery's residence they parked several houses away and observed the house prior to approaching Towery. On December 13, FBI agents visited with Towery at his residence. Towery initially evaded answering several questions about the text. He ultimately admitted he had received the campaign text and responded to the text. He first claimed he responded because he thought the text was from a fake telemarketer, but then later volunteered that he does not like Democrats.[6] He later attempted to clarify that his text was "flippant," not "sincere," and a "spur of the moment thing."[7] During this interview, Toliver did not initially claim that he thought one of his friends were playing a prank. Later during the interview, he stated that he did not understand why Democrats would ever send him a text message, and that maybe a friend played a prank on him and gave the Democrats his cell number. Towery's comment about his message being "flippant" is at odds with his claim that he thought he was responding to a prank. His comment that his friends gave his cell number to the Democrats is also indicative that he knew he was sending the message to "the Democrats." When Towery was asked if the agents could see the text message on his phone, they discovered that the text message had been deleted from Towery's phone. Towery denied that he had any travel plans or plans to engage in any threatening behavior. Towery was warned by the agents that threats are taken very seriously and although he has free speech rights that he may exercise, once he engages in threats, such behavior crosses the line.[8] The interview with Towery lasted for over an hour because law enforcement officers wanted to "burn the clock" to allow then-candidate Biden to safely leave his campaign event.

---

[6] Gov't Ex. 2.
[7] Gov't Ex. 2.
[8] Gov't Ex. 2.

The Court does not find the Defendant's trial testimony credible. As he attempted to explain away his inconsistent responses to the law enforcement officers during his interview at his home, his story has varied wildly: From initially stating that "fake marketers" were to blame for his receiving the Biden campaign text, to stating that he thought his friends gave his number to the Democrats, to the now changing story that he thought his friend Chris "spoofed" the campaign message, and he thought he was responding to "Chris," Defendant's inconsistent statements and testimony are wholly unbelievable.  That Towery deleted the text message at issue in this case and not others before law enforcement officers arrived at his home further supports that he knew his message was not sent to a friend or a "fake marketer.[9]"

18 U.S.C. § 875(c) states:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

Thus, conviction under this provision requires proof that: (1) the defendant transmitted something, (2) the thing transmitted was a threat to injure the person of another, and (3) the transmission was in interstate or foreign commerce. *Elonis v. United States*, 575 U.S. 723, 743, 135 S. Ct. 2001, 2014, 192 L. Ed. 2d 1 (2015); *United States v. Howard*, 947 F.3d 936, 946 (6th Cir. 2020).[10]

---

[9] Towery had a practice of including marketers into his contacts so when they called him, he could respond to them in a hostile fashion.

[10] Other courts have described this crime as containing four elements:
   (1) the defendant knowingly transmitted in interstate or foreign commerce a communication;
   (2) the communication contained a "true" threat, that is, a reasonable person would perceive the communication to constitute a threat (i.e., the objective component);
   (3) the communication threatened to kidnap any person or to injure the person of another; and
   (4) the defendant intended that the communication serve as a threat or knew that the communication would be viewed as a threat (i.e., the subjective component).
See *United States v. Baker*, 514 F. Supp. 3d 1369, 1376 (N.D. Fla. 2021).

Like in *Elonis*, at issue in this case is the *mens rea* required with respect to the second element—that the thing transmitted was a true threat to injure the person of another.[11]

In *Elonis*, the defendant posted messages to his Facebook account that appeared to threaten his ex-wife, co-workers, a kindergarten class, the local police, and an FBI agent. He was later charged with violating 18 U.S.C. § 875(c). The jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and the Supreme Court concluded that was error and reversed the case and remanded.[12] The Supreme Court, however, refused to address whether recklessness suffices for liability under § 875(c).[13]

In a concurrence, Justice Alito stated: "The Court's disposition of this case is certain to cause confusion and serious problems. Attorneys and judges need to know which mental state is required for conviction under 18 U. S. C. §875(c), an important criminal statute."[14] This Court faces this precise issue in the present case.

In Justice Alito's view, "the term 'threat' in § 875(c) can fairly be defined as a statement that is reasonably interpreted as 'an expression of an intention to inflict evil, injury, or damage on another.' Webster's Third New International Dictionary 2382 (1976). Conviction under § 875(c) demands proof that the defendant's transmission was in fact a threat, i.e., that it is reasonable to interpret the transmission as an expression of an intent to harm another. In addition, it must be

---

[11] "Threatening communications that are not conditional, not clearly political in context, and do not 'in any sense contribute to the values of persuasion, dialogue, and the free exchange of ideas,' are true threats and fall outside of the First Amendment's protection." *United States v. Dierks*, 978 F.3d 585, 590 (8th Cir. 2020), cert. denied, 142 S. Ct. 472, 211 L. Ed. 2d 287 (2021).
[12] *Elonis*, 575 U.S. at 740.
[13] *Elonis*, 575 U.S. at 742.
[14] *Elonis*, 575 U.S. at 742.

shown that the defendant was at least reckless as to whether the transmission met that requirement." *Elonis*, 575 U.S. 723 at 743–44.

This Court adopts the position set forth by Justice Alito. Courts outside the Fifth Circuit have likewise adopted this approach. The Fifth Circuit has not addressed the issue.

Post-*Elonis*, the Sixth and Third Circuits have stated: "The government does not have to prove the defendant intended to carry out the threat or was even capable of carrying out the threat at the time it was made. The government is not required to prove the defendant made the targeted individual feel threatened or that the targeted individual even knew about the threat against him." *United States v. Howard*, 947 F.3d 936, 946 (6th Cir. 2020). In a § 875(c) prosecution, "the United States must prove both that the defendant transmitted the communication subjectively intending to issue a threat or with knowledge that the communication would be viewed as a threat, and that a reasonable person would view the communication as a threat." *See United States v. Elonis* (*Elonis II*), 841 F.3d 589, 596 (3d Cir. 2016)." *United States v. Nissen*, 432 F. Supp. 3d 1298, 1318 (D.N.M. 2020).

The Fourth Circuit has phrased the issue as follows:

> That is: (1) that the defendant knowingly transmitted a communication in interstate or foreign commerce; (2) that the defendant subjectively intended the communication as a threat; and (3) that the content of the communication contained a "true threat" to kidnap or injure. To prove the second element, the Government, consistent with *Elonis*, must establish that the defendant transmitted the communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," or, perhaps, with reckless disregard for the likelihood that the communication will be viewed as a threat. *See Elonis*, 135 S. Ct. at 2012–13. And to establish the third element, in keeping with our prior cases, the prosecution must show that an ordinary, reasonable recipient who is familiar with the context in which the statement is made would interpret it as a serious expression of an intent to do harm.

*United States v. White*, 810 F.3d 212, 220–21 (4th Cir. 2016).

In *Elonis II*, the Third Circuit concluded that "Section 875(c) contains both a subjective and objective component, and the Government must satisfy both in order to convict a defendant under the statute." To "satisfy the subjective component of Section 875(c), the Government must demonstrate beyond a reasonable doubt that the defendant transmitted a communication for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat." To satisfy the objective component, the Government must "prove beyond a reasonable doubt that the defendant transmitted a communication that a reasonable person would view as a threat." "The objective component of Section 875(c) shields individuals from culpability for communications that are not threatening to a reasonable person, distinguishing true threats from hyperbole, satire, or humor." "It requires the jury to consider the context and circumstances in which a communication was made to determine whether a reasonable person would consider the communication to be a serious expression of an intent to inflict bodily injury on an individual." *Elonis II*, 841 F.3d at 596–97. In affirming his conviction, the Third Circuit held that a "review of the evidence surrounding [the Facebook] posts unequivocally demonstrates the jury would have convicted Elonis were it required to find that he either knew his ex-wife would feel threatened by the posts or that he purposely threatened her."[15]

This Court finds beyond a reasonable doubt that: (1) the Defendant knowingly transmitted a communication in interstate commerce; (2) the Defendant subjectively intended the communication as a threat; and (3) the content of the communication contained a "true threat" to injure. The defendant transmitted the communication for the purpose of issuing a threat, or with

---

[15] *Elonis II*, 841 F.3d at 598.

knowledge that the communication would be viewed as a threat, or, alternatively with reckless disregard for the likelihood that the communication would be viewed as a threat.

Defendant William Oliver Towery is **GUILTY** of Count One of the Indictment charging him with violation of 18 U. S. C. §875(c).

It is so **ORDERED**.

**SIGNED** this 14th day of March, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE